# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### May 7, 2002 Session

## STATE OF TENNESSEE v. DEREK T. PAYNE

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 97-06900, 01     James C. Beasley, Jr., Judge**

---

**No. W2001-00532-CCA-R3-CD - Filed November 20, 2002**

---

The defendant, Derek T. Payne, was convicted by a Shelby County Criminal Court jury of second degree murder, a Class A felony, and attempted especially aggravated robbery, a Class B felony, and was sentenced by the trial court to an effective sentence of thirty-seven years in the Department of Correction. In this appeal as of right, he challenges the sufficiency of the evidence in support of his convictions, the sentences imposed, and the trial court's evidentiary rulings. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

William D. Massey (at trial and on appeal) and Gerald D. Skahan (at trial), Memphis, Tennessee, for the appellant, Derek T. Payne.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; Karen Cook and Reginald R. Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On July 1, 1997, the Shelby County Grand Jury returned indictments against the defendant, charging him in a one-count indictment with criminal attempt to commit especially aggravated robbery, and in a two-count indictment with first degree premeditated murder and first degree felony murder, for the November 24, 1996, killing and attempted robbery of the twenty-three-year-old victim, Brian Pritchard. The defendant was subsequently convicted by a jury of second degree murder and attempted especially aggravated robbery. He was sentenced by the trial court to the maximum terms of twelve years as a Range I, standard offender for the attempted especially

aggravated robbery conviction and twenty-five years as a violent offender for the second degree murder conviction, with the sentences to be served consecutively, for an effective sentence of thirty-seven years. Following the denial of his motion for a new trial, he filed a timely appeal, presenting the following issues for our review:

I. Did the trial court err by overruling the defense motion in limine and permitting Eric Rogers to testify that he was being robbed at gunpoint by Keith Brown just before the shooting of [the victim] by the defendant?

II. Did the trial court err by overruling the defense motion in limine and permitting Eric Rogers to testify that Keith Brown said "Don't shoot him, Derek, don't shoot him" in violation of the hearsay rule and in violation of the defendant's right of confrontation?

III. Is the evidence sufficient to negate the existence of self-defense beyond a reasonable doubt?

IV. Is the evidence sufficient to negate beyond reasonable doubt that the killing was accomplished in a state of passion produced by adequate provocation?

V. Is the evidence sufficient to sustain the verdict of guilt of attempted especially aggravated robbery?

VI. Did the trial court err by applying the enhancement factor for committing a crime under circumstances under which the potential for bodily injury to a victim was great to the attempted especially aggravated robbery conviction?

VII. Did the trial court err in sentencing the defendant to the maximum term of 25 years for second degree murder and to the maximum term of 12 years for attempted especially aggravated robbery?

**State's Proof**

At the defendant's trial, Dr. Wendy Gunther, the forensic pathologist who performed the autopsy of the victim's body, testified that the victim died from a gunshot wound to the head in which the bullet entered in front of his left ear, traveled through his head, and lodged in the skull bone behind and below his right ear. In addition to the gunshot wound to the head, which would have been immediately fatal, the victim also suffered what Dr. Gunther characterized as "flesh

wound[s]" to both legs, caused by bullets that traveled through the "deep meat" of his thighs but did not hit any blood vessels, bones, or major nerves. She testified that she found three gunshot wounds in the victim's right leg, consisting of one entrance wound and two exit wounds in the thigh that were caused by either a single bullet that broke into two pieces or two bullets that entered at the same place, and two gunshot wounds in his left leg, consisting of an entrance wound and an exit wound in the thigh. The gunshot wounds in both legs occurred, roughly, from the back to the front of the victim's thighs. The wounds to the victim's legs would not have prevented him from standing or running. Dr. Gunther could not determine at what distance the fatal gunshot was fired, what position the victim was in when shot, or whether the gunshot wounds were inflicted by one or two guns. She said that the victim's blood-alcohol level was 0.11 grams per deciliter, and that his toxicology report revealed no drugs of any kind in his system.

Thomas Hughlett testified that the defendant was formerly his uncle's stepson and was "like a cousin." On November 24, 1996, he was barbequing at his mother's house in Memphis when the defendant came by and asked him "to take him on Aubra Street." When he refused, the defendant pulled two guns out of his clothing and said, "I'm going to kill me a motherfucker and I ain't going back to jail. I'm going to hell." Hughlett agreed on cross-examination that the defendant was not "acting right," testifying that his eyes looked "glossy" and he appeared to be under the influence of some kind of drug. He was aware that the defendant had been snorting powder cocaine for a number of months, but did not know if he had used any that day. He conceded, however, that he had told police officers that the defendant became "crazy" and "a whole different person" when he was on cocaine.

Eric Rogers, a friend of the victim, testified that the victim was with him on the evening of November 24, 1996, as he responded to a page he had received from someone at a residence on Aubra Street. He said that when he pulled his car into the driveway, he saw the defendant's face at the upstairs window of an apartment belonging to a woman named Nicole. Leaving the victim in his car, he got out and went up to the apartment to find out who had paged him. On his way up, he saw the defendant sitting on the hallway stairs with Keith Brown. When told by the apartment's occupants that no one there had paged him, he headed back out to his car. He had paused to talk downstairs with a woman named Christine when Brown asked if he had a light. Rogers said that he gave Brown a book of matches, and then started toward his car. He did not see the victim.

Rogers testified that as he was walking to the car, Brown pulled a gun on him and ordered him to "drop it off." He said that he threw his arm up and ran around the car. He slipped and fell, and Brown pulled him up by his shirt and demanded again that he "drop it off." After Rogers had given Brown $142, Brown asked where his car keys were and was told they were in the car. At that point, he heard Brown repeatedly say, "Derek, don't shoot. Derek, don't shoot," and looked around to see the victim and the defendant on the front porch of the "complex" next door.[1] He then heard two or three gunshots. In response to the gunshots, he ran around Nicole's building. He next saw

---

[1] Crime scene photographs reveal that the "complex" referred to by Rogers, comprising 1185 and 1187 Aubra, is a one-story duplex with a long front porch.

Brown get into his car and pull out into the street, the defendant run off the front porch of the duplex and jump into the car, and both men drive off. He later identified Brown and the defendant from photographic spreadsheets shown to him by the police.

Rogers testified on cross-examination that he had known the defendant for about fifteen years, but they were not friends. He said that the defendant had known his pager number, although acknowledging he had told police two days after the shooting that the defendant did not. In addition to Nicole, men he knew as "Head" and "Twin" were in Nicole's apartment when he arrived. He did not see the defendant with a gun when he went up to the apartment, and saw Brown, but not the defendant, when he came back outside the building. He testified that he saw the defendant and the victim on the porch after Brown yelled to the defendant not to shoot, and that he thought he saw the defendant standing over the victim. He said that the two or three gunshots he heard from the porch, the last of which may have occurred after a slight pause, "had to come from [the defendant]." However, he acknowledged that he did not see the victim get shot, did not see the defendant with a gun, and did not see what transpired between the victim and the defendant before the shooting.

Rogers admitted that it was dark at the time of the shooting and that he had testified during the preliminary hearing that, although he had seen someone standing on the porch, he had not been able to see who it was. He acknowledged that he went to his mother's house after the shooting and that later he, "Premo," and "Tam" had gone armed with pistols to the West Memphis trailer home of the defendant's girlfriend, where they had kicked in the door and demanded to know the defendant's whereabouts. He also acknowledged that both he and the victim had both been involved with drugs at the time of the shooting.

Kenneth Ezell, who was 14 when the shooting occurred, testified that he was on the front porch of a duplex at 1185 Aubra Street at about 6:30 or 7:00 p.m. on November 24, 1996, when he saw the victim and Rogers pull up in a car. Ezell said that the next-door neighbor, Roger Lee, was on the porch with him at the time, as well as "Twin," whose real name, he believed, was Kevin Phillips. Rogers went next door, and the victim came up onto the porch of 1185 Aubra and began talking with Lee. Ezell said that the victim stood talking on the porch for about thirty minutes until they heard "a commotion" next door from the house he had seen Rogers enter, which caused everyone to turn around and look. When they did so, "there was a guy with two (2) guns saying drop it off." According to Ezell, the man was pointing his guns at the entire group on the duplex's porch, and was not directing his words to any particular person. He said that when he saw the guns and heard the command to "drop it off," he ran into the house. Two or three seconds later, he heard three or four gunshots. After approximately twenty minutes, he went back outside and saw the victim lying on the porch. Ezell identified the defendant as the man he had seen with the two guns. He testified that he did not see the victim, "Twin," or Lee with a gun that evening, and that he had not had a gun either.

Ezell testified on cross-examination that he had seen the defendant around the neighborhood prior to November 24, 1996, but the first time he saw him on the day of the shooting was at about 7:30 p.m. He did not remember telling the police after the shooting that he was not on the porch

when the defendant arrived, or telling an investigator in an August 26, 1999, telephone conversation that he did not come through the area until after everything had already happened. He also did not remember having said that he and Lee were the only ones on the porch that evening. He testified that he was on the porch immediately before the shooting, and that Lee, "Twin," and "Mug" were on the porch with him. The "Twin" on the porch with him was not Kevin Phillips, as he had suggested during his direct examination testimony, but instead was "another twin out of Hilltop, right down the street." However, Phillips had been "out there for a minute" before walking to a store. He did not recall any drug activity that night, denied any knowledge about any drug sales that might have been taking place on the street, and was not aware of what the victim and Rogers did for a living. He acknowledged that he heard someone yell, "They're fighting" just before he went into the house. He testified on redirect, however, that the defendant and the victim had not been fighting.

An eyewitness to the shooting, Kevin Phillips ("Twin"), testified that he had been in the area all day. The victim was talking to Robert Lee when Phillips left to go to the store. When he returned from the store, he saw Keith Brown chasing Eric Rogers around a car. At the same time, the defendant ran up, grabbed the victim, and slung him facedown onto his stomach with his hands out to his sides. The defendant told the victim to give him his money. The victim replied that he did not have any, and was "pulling his pockets out trying to show him he didn't have [any] money" when the defendant "all of a sudden" shot him. The victim said, "I ain't got no money, don't shoot me." The defendant shot him again. The victim said, "Please don't kill me." The defendant then shot him again.[2] During the shooting, Brown asked the defendant what he was doing and told him not to shoot or kill the victim.

Two days after the shooting, he identified the defendant from a photographic lineup as the victim's shooter. Phillips also made a positive courtroom identification of the defendant as the shooter. He testified that the defendant had two guns at the time of the shooting, and that he had also seen the weapons earlier that day when the defendant was "[f]lashing them around." As far as he knew, the victim did not have a weapon. On cross-examination, Phillips acknowledged that the victim and Rogers were both friends of his, and conceded that the defendant "probably" was "strung on crack cocaine" that night. He insisted, however, that he knew nothing about any drug activity on the street.

Officer Cham Payne of the Memphis Police Department Crime Response Unit testified that he and his partner received a call about the shooting at 6:45 p.m. When they arrived at the scene, 1185 and 1187 Aubra, which was a duplex, they found the victim lying on his back on the front porch in front of the door to 1185. Sergeant Thomas Helldorfer, a homicide investigator with the Memphis Police Department, testified that, as part of his investigation of the crime, he searched for the defendant at various locations, including the Aubra neighborhood and his grandmother's house on New York, but was unable to find him.

---

[2]While Phillips testified that the defendant shot the victim three times, it is not clear as to whether he watched as all three shots were fired, or watched two shots and heard the third.

## Defense Proof

The first defense witness was Steven Paul Rossby, Ph.D., a molecular neurobiologist on the faculty of Vanderbilt University School of Medicine, who was allowed to offer expert testimony on serotonin and its relationship to human behavior. Dr. Rossby testified that serotonin is one of a number of naturally occurring chemicals in the brain known as neurotransmitters, which fall into one of two categories: excitatory neurotransmitters, or chemicals that cause the nerve cells to fire impulses, and inhibitory neurotransmitters, or chemicals that inhibit or prevent the nerve cells from firing. Serotonin, which acts to inhibit the firing of nerve impulses, has been the subject of extensive research for over twenty years because it appears not only to be an inhibitory neurotransmitter, but also to control or orchestrate other inhibitory systems in the brain. Dr. Rossby explained that the various inhibitory systems in the human brain have evolved

> so that we don't act on every impulse, so that we may get angry but we don't go beyond it, we control our anger, or we -- we don't respond to everything that's happening impulsively, that we -- we have a chance -- we have some control within the limbic system. This has evolved over -- I don't know how many millions of years these systems have evolved to protect us from just acting purely impulsively.

Dr. Rossby testified that the research in the field has consistently shown a link between low serotonin levels and "explosive impulsive violence." In addition, scientists have discovered that Type II alcoholism and intermittent explosive disorder are both linked to low levels of serotonin. He described a Type II alcoholic as "the mean drunk," "[t]he person who has a couple of drinks and, then, becomes suddenly violent and angry," and testified that intermittent explosive disorder is characterized by a "sudden loss of control and an explosive violent behavior that seems to have been triggered by little or nothing at all." He explained the relationship between low serotonin and violent behavior as follows:

> Low serotonin, in itself, does not cause violence. Low serotonin only indicates your capacity for dealing with your anger, . . . your biological capacity to control yourself. But it doesn't actually -- Serotonin does not produce violence. I mean, many people have low serotonin and they are depressed all of the time. And many people have low serotonin and they can't stop gambling. But it depends on a person's early childhood experiences and a lot of other factors. But with low serotonin, once the impulsive behavior has been -- has been released, the low serotonin indicates your -- your ability to take it back or control it. And many people who have low serotonin are virtually incapable of controlling their impulsive behavior.

Although he agreed that cocaine was a stimulant, he testified that scientific studies have not shown a link between serotonin levels and cocaine use. Therefore, he could not say whether chronic cocaine use by an individual with low serotonin would exacerbate the lack of inhibition.

Dr. Rossby testified that he determined the defendant's serotonin level was low by performing a statistical comparison of his average serotonin level to the average levels of thirty-four controls – men who were diagnosed by Vanderbilt psychiatrists to be "normal"; *i.e.*, with no mental illnesses and no family history of mental illnesses. The defendant's average serotonin level was 78.5 nanomoles. The thirty-four controls had average serotonin levels ranging from a low of 87.5 nanomoles to a high of 250 nanomoles, with the average or mean at 142.1 nanomoles. Using statistical tests and the data from the controls, he concluded that 89% of the males in the total population have higher serotonin levels than the defendant. The defendant's serotonin level, in fact, was "among the lowest" he had seen. Since the studies indicate that a man's serotonin level will remain stable throughout his life until he reaches the age of about 50 or 60, when serotonin levels tend to rise, he could assume that the defendant's serotonin level at the time he conducted his tests, in 1999, was reflective of his serotonin level at the time of the shooting, in 1996. Dr. Rossby testified that his opinion, "given the level of [the defendant's] serotonin and given the scientific literature and all of the studies," was that the defendant's "capacity to control [an] impulse once it has occurred is virtually non-existent."

On cross-examination, Dr. Rossby acknowledged that in order for serotonin to be related to a crime, the crime would have to be impulsive. He further acknowledged that the Finnish researchers who conducted the watershed study on the subject, a study to which he had referred numerous times during his testimony, had not included crimes in which the perpetrator had had a potential monetary motive, or had known his victim, in the group of crimes they considered impulsive. He said, however, that those criteria were merely used by the original researchers as "a convenience . . . to try to roughly separate the prisoners into two (2) groups so they could study the differences"; under the current scientific knowledge, a crime could be considered impulsive even if committed for potential monetary gain, or against someone known to the perpetrator.

The twenty-five-year-old defendant also testified in his own defense. He said that at the time of the incident he was making his living by selling drugs and gambling and had been engaging in those activities since he was 15. He often went to the Aubra Street neighborhood to sell "dope," and was there selling drugs at the time the shooting occurred. He was armed with a .22 pistol, which he always carried with him, due to the nature of his business and the neighborhood which he frequented. The defendant testified that it is common for people in the drug trade to be armed. He said that he knew both Rogers and the victim from the neighborhood, and knew that they were also involved in the drug trade. He testified that Rogers was the supplier of most, if not all, of the drugs sold in the neighborhood and that the victim was one of his sellers. Although Rogers attempted to control all the drug activity in the area, the defendant did not work for him.

The defendant testified that he was smoking a marijuana cigarette and urinating against the side of the house when the victim and Rogers pulled up. He saw the victim get out of the car and

then heard him arrange to sell a "dude" $100 worth of cocaine. When the victim ran upstairs to get the drugs, he stepped forward and "gave Dude a better deal." The victim came back down, learned from the drug buyer that the defendant had already sold him the drugs, became angry, and accused the defendant of stealing his sale. The defendant said that he answered by telling the victim, in effect, that he was just out there to make a living like everybody else. The victim responded by telling him that he should not be selling drugs in his area. The defendant said that he took offense and told the victim, "You have me f'd up." Next, the victim acted as if he were going to walk away, but then turned and reached for his gun.

The defendant testified that when he saw the victim reach for his gun, he grabbed the victim's hand and the two began "tussling." During the struggle, he picked the victim up and slung him down on the porch, causing the victim's gun to slide out of his hand. After he threw the victim down, he brought his gun out and shot him twice in rapid succession. When the victim began crawling toward his gun, he ran forward, grabbed the victim's gun, and shot him again. According to the defendant, the entire episode occurred within the space of seconds or, in his words, "all at once." He could not clearly remember everything that had occurred, but knew that he ran to the corner after the victim fell. When asked if he had intended to rob the victim, the defendant answered, "No, sir. I had too much money in my pocket. I had over fifteen hundred (1,500)." He said that he threw the victim's gun, along with his own, into the river as he drove across the bridge into Arkansas.

The defendant further testified that he had been using large amounts of marijuana, cocaine, and alcohol, and was under the influence of both cocaine and alcohol at the time the shooting occurred. He said that he "smoke[d] weed like cigarettes," "dr[a]nk wine like water . . . all day every day," and snorted "[a]bout half an ounce a day" of cocaine. He began drinking and using drugs at the age of 4, when his uncles started giving him alcohol and marijuana to amuse themselves by watching him get high. Later, when they tried to get him to quit, it was too late. He said that he had lived in two treatment facilities as a child: MMHI, where he lived when he was 9 or 10, and Sequoia Center, where he lived for about two years. At both facilities, he was prescribed "a lot of drugs," whose names he could not remember. He first heard the term "intermittent explosive disorder" when he was about 5 or 6 and was put into treatment. Although he did not understand what the term meant, he remembered that he used to lose his temper almost every day, and that he would get so upset that he would "blank out." When he came to, he could not always remember what he had done while he was "blanked out."

On cross-examination, the defendant denied having had two guns when he went to Hughlett's house, or having been with Brown at the Aubra Street location. He admitted that he had accepted a ride from Brown after the shooting, but said that he had not known anything about Brown's robbery of Rogers at the time. He testified that he had been around the corner using a pay phone when Brown pulled up and offered him the ride. He said that he had "snapped" when the victim pulled the gun on him, but acknowledged that he did not say anything in his statement to the police, when they located him several months later, about the victim's having pulled a gun. He explained this omission by testifying that he had told the police only what he "felt that they needed to know," that he had killed the victim but had not robbed him. He admitted that his memory of the events

-8-

surrounding the shooting was not perfect, and that some of what he remembered might have occurred in his dreams. On redirect, he testified that he had told the same story he was telling in court to his defense counsel and their investigators "[m]any, many times."

After deliberating, the jury found the defendant guilty of second degree murder and attempted especially aggravated robbery. Finding several enhancement factors applicable, and no strong factors in mitigation, the trial court sentenced the defendant to the maximum terms of twelve years as a Range I, standard offender for the attempted especially aggravated robbery conviction, and twenty-five years as a violent offender for the second degree murder conviction. The sentences were ordered to be served consecutively, for a total effective sentence of thirty-seven years.

## ANALYSIS

### I. Admissibility of Evidence of Brown's Robbery of Rogers

As his first issue, the defendant contends that the trial court erred by allowing Eric Rogers to testify that he was being robbed by Keith Brown just prior to the shooting of the victim.

The admission of evidence generally lies within the sound discretion of the trial court and will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Gilliland, 22 S.W.3d 266, 270 (Tenn. 2000); State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 743 (Tenn. 1998). As our supreme court has explained:

> Because the term "discretion" essentially "denotes the absence of a hard and fast rule," we will reverse a decision to admit evidence "only when the 'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'"

Gilliland, 22 S.W.3d at 270 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)). We review this issue, therefore, under an abuse of discretion standard.

The defendant contends that evidence that Brown was robbing Rogers should have been excluded either under Tennessee Rule of Evidence 401 on the basis that it was irrelevant to any issue at trial, or under Tennessee Rule of Evidence 404(b) on the basis that its probative value was outweighed by the danger of unfair prejudice. With respect to the latter, he argues that the jury could have inferred from the testimony that he and Brown were partners in crime, and thus attributed Brown's actions to him. The State responds that the trial court properly found the evidence to be relevant in order to establish the contextual framework for Rogers's testimony, and that Rule 404(b) is inapplicable because the challenged "other crime" was committed by Brown, not the defendant. The State further argues that any prejudicial effect created by the evidence was slight, pointing out that Rogers's testimony did not directly implicate the defendant in the crime, and that the trial court instructed the jury that the defendant was not charged with the robbery of Rogers and it was not to

consider evidence of that robbery when making its determination of the defendant's guilt of the offenses with which he was charged. We agree with the State.

Tennessee Rule of Evidence 404(b) which, with certain exceptions, prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity with the character trait" is inapplicable in this situation, since the crime at issue was committed by Brown, and the State presented no direct evidence that the defendant was involved. The appropriate analysis of this issue, therefore, is under Tennessee Rules of Evidence 401 and 403. Rule 401 provides that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 403 provides that relevant evidence, which under Rule 402 is generally admissible, may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The trial court found that Rogers and Brown were both "an integral part of [the] whole scenario" and that there was no meaningful way for the State to present Rogers's testimony without introducing evidence that he was being robbed by Brown. Consequently, the court ruled that the evidence was relevant in order to establish the context for Rogers's testimony, including the conditions that existed at the time he heard Brown's statement to the defendant. The court stated, however, that it would instruct the jury that it was not to hold the defendant accountable for the robbery of Rogers:

> [I]f there is circumstantial evidence that Mr. Rogers and [the victim] were connected, if there is circumstantial evidence that this is an overall combination of interest by [the defendant] and Mr. Brown, those are issues for the jury to decide. But I can tell the jury that they are not to hold [the defendant] accountable for what happened to Mr. Rogers. That's the only way I know how to do that.
>
> I don't believe you can exclude the facts of what's going on at the same time under the scenario y'all are giving me. I don't see any way to do that at all. So I'll deny that motion.

We find no abuse of discretion by the trial court in this matter. The evidence was relevant to show the context in which Rogers heard Brown's statement and witnessed some of the events that transpired on the porch of the duplex. Moreover, its probative value was not substantially outweighed by the danger that it would unfairly prejudice the defendant. In fact, that Rogers was being robbed as the victim was being robbed and shot would appear relevant to explain why Rogers was not more attentive to the victim's plight and did not try to aid him. To minimize the evidence's prejudicial effect, the trial court twice instructed the jury, at the time the testimony was presented, that the defendant was not being charged with the robbery of Rogers and it should not consider any evidence of that robbery in its determination of the defendant's guilt. Furthermore, the trial court

repeated the same instruction to the jury at the conclusion of the trial, providing the following signed, handwritten instruction: "Members of the Jury, there was some testimony presented about a Robbery of Eric Rogers by Keith Brown. [The defendant] has not been charged with that offense and you are not to decide this case based upon any crime that may have been committed against Eric Rogers." We, therefore, conclude that the trial court did not err in admitting the evidence.

## II. Admissibility of Keith Brown's Statement, "Derek, don't shoot," to Defendant

The defendant next contends that the trial court erred by allowing Eric Rogers to testify that he heard Keith Brown call out, "Derek, don't shoot. Derek, don't shoot," just before the victim was shot, arguing the statement was inadmissible hearsay that violated his right to confrontation. The State contends, *inter alia*, that the trial court properly admitted the statement under the excited utterances exception to the rule against hearsay.

A hearsay statement is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible at trial unless it falls under one of the exceptions to the rule against hearsay. Tenn. R. Evid. 802. "The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court." State v. Stout, 46 S.W.3d 689, 697 (Tenn.), cert. denied, 534 U.S. 998, 122 S. Ct. 471, 151 L. Ed. 2d 386 (2001). As such, we will not reverse the trial court's ruling absent a showing that it abused its discretion. Id.

The trial court ruled the statement admissible under the excited utterances exception to the rule against hearsay, which provides that an otherwise inadmissible hearsay statement is admissible if shown to be "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." See Tenn. R. Evid. 803(2). Were we to determine that Brown's words constituted hearsay, we would conclude that the events that transpired immediately before he spoke were sufficiently startling to warrant admission of the statement as an excited utterance. However, commands, instructions, and questions often are not hearsay because they are not offered to prove the truth of their content. See State v. Lequire, 634 S.W.2d 608, 612 (Tenn. Crim. App. 1981); State v. Oneal Sanford, No. E1999-02089-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 440, at **19-20 (Tenn. Crim. App. June 18, 2001), perm. to appeal denied (Tenn. Nov. 5, 2001); State v. Lucien Samuel Sherrod, No. 01C01-9505-CR-00157, 1997 Tenn. Crim. App. LEXIS 89, at *19 n.5 (Tenn. Crim. App. Jan. 30, 1997); State v. Reginald S. Mabone, No. 02C01-9203-CR-00054, 1993 Tenn. Crim. App. LEXIS 462, at *3 (Tenn. Crim. App. July 21, 1993), perm. to appeal denied (Tenn. Oct. 4, 1993). Thus, this court has previously held that a declarant's instruction to "shoot this mother-fucker" did not qualify as hearsay because it was not offered to prove the truth of the matter asserted. Mabone, 1993 Tenn. Crim. App. LEXIS 462, at *2. In this case, we likewise conclude that Brown's command to the defendant not to shoot the victim does not qualify as hearsay. Therefore, although the trial court erred in finding the statement admissible under the excited utterances exception to the rule against hearsay, it did not err in admitting the statement.

-11-

### III.  Sufficiency of the Evidence

The defendant's third, fourth, and fifth issues involve challenges to the sufficiency of the evidence.  In considering these issues, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt.").

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### A.  Second Degree Murder

The defendant contends that the evidence was insufficient to negate beyond a reasonable doubt that he acted either in self-defense, which would make him not guilty of the offense, or in a state of passion produced by adequate provocation, which would make him guilty of voluntary manslaughter rather than second degree murder.  As support for his claim of self-defense, he argues that the jury's failure to find him guilty of either premeditated or felony murder makes it "apparent that the jury accredited [his] testimony on the material events leading up to this killing"; namely, that he shot the victim, after a struggle, as the victim was reaching for his gun.  As support for his claim

of voluntary manslaughter, he argues that his low serotonin level, which severely impairs his ability to resist impulses, combined with evidence the victim confronted him over the "stolen" drug sale and that they engaged in a struggle, provides "compelling evidence that [he] acted in a state of passion produced by adequate provocation."

The State responds that the evidence was more than sufficient to support the defendant's conviction for second degree murder. Citing Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973), the State argues that the seemingly inconsistent verdicts, in which the jury found the defendant not guilty of felony murder but guilty of second degree murder and criminal attempt to commit especially aggravated robbery, do not permit the defendant to infer that the jury did not accredit the testimony of the State's witnesses. The State asserts that the evidence at trial, taken in the light most favorable to the State, was more than sufficient for the jury to reject the defendant's claim of self-defense and find that he committed a knowing killing of the victim. Regarding the defendant's claim that the shooting constituted voluntary manslaughter instead of second degree murder, the State argues that the evidence did not show the defendant was provoked, the jury was entitled to reject his diminished capacity defense, and his subjective serotonin level was irrelevant to the determination of whether he was in a state of passion sufficient to lead a reasonable person to act in an irrational manner.

Second degree murder is defined as "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210(a) (1997). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a) (1997). Tennessee Code Annotated section 39-11-611 provides, in pertinent part:

> **Self-defense. --** (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (1997).

The defendant first contends that the State failed to refute the existence of self-defense beyond a reasonable doubt. Since the defense of self-defense was fairly raised by the evidence, the State carried the burden of proof to negate the defense beyond a reasonable doubt. See Tenn. Code Ann. § 39-11-201(a)(3) (1997); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, whether or not a defendant acted in self-defense is a question of fact for the jury to determine. See State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Ivy, 868

S.W.2d 724, 727 (Tenn. Crim. App. 1993). The jury was instructed on the defense of self-defense. By finding the defendant guilty of second degree murder, it obviously rejected the defendant's claim that he shot the victim in self-defense, choosing instead to accredit the testimony of the witnesses for the State. This was its prerogative.

The defendant argues, nonetheless, that the jury's failure to convict him of either premeditated or felony murder demonstrates that it could not have accepted the State's theory of the case or accredited the testimony of the State's witnesses. According to his reasoning, had the jury accredited the testimony of the State's witnesses, "the verdict would of necessity have been guilty of premeditated murder or murder in the perpetration of a felony." However, he concedes that there is "decided authority contrary to [his] position."

The "decided authority" the defendant recognizes, Wiggins v. State, 498 S.W.2d 92, 93 (Tenn. 1973), holds that there is no requirement for consistency between verdicts on separate counts of an indictment. In Wiggins, our supreme court adopted the reasoning used by the United States Supreme Court in Dunn v. United States, 284 U.S. 390, 52 S. Ct. 189, 76 L. Ed. 356 (1932), concluding that "consistency in the verdicts is not necessary as each count of an indictment is to be regarded as a separate indictment." 498 S.W.2d at 93. An appellate court should not, therefore, "upset a seemingly inconsistent verdict by speculating as to the jury's reasoning" if it is "satisfied that the evidence establishes guilt of the offense upon which the conviction was returned." Id. at 94.

The evidence here, viewed in the light most favorable to the State, was sufficient for the jury to reject the defendant's claim of self-defense. Conflicts in the trial testimony are resolved by the trier of fact, not this court. See Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). The defendant's testimony that he shot the victim during a struggle that was precipitated by the victim's having pulled a gun on him was contradicted by the witnesses who testified on the State's behalf. Kenneth Ezell testified that he did not see anyone other than the defendant with a gun, and that the victim and the defendant were not fighting. Eric Rogers testified that he heard Brown yell "Derek, don't shoot," and that he saw the defendant and the victim together on the porch. Although he was uncertain, Rogers thought he saw the defendant standing over the victim's body. Kevin Phillips, an eyewitness to the shooting, testified that the defendant grabbed the victim, threw him down onto the porch, and demanded his money. The victim told the defendant he did not have any money, and pulled his pockets out to demonstrate that they were empty. The defendant then shot the victim as the victim lay facedown on the porch with his hands out to his sides, pleading not to be shot or killed. Phillips did not see the victim with a gun. As the defendant was shooting the victim, Brown was yelling to him, "Don't shoot him" and "Don't kill him." This evidence was more than sufficient for a rational trier of fact to conclude that the shooting did not occur in self-defense.

The defendant next contends that the evidence was insufficient to show that he was capable of forming the knowing *mens rea* required for second degree murder. He argues that evidence that his low serotonin level impairs his ability to resist impulses, combined with evidence that the victim provoked him by confronting him about the stolen drug sale, supports the conclusion that his "reason was obscured to the point that he acted in the heat of passion engendered by adequate

-14-

provocation." He further argues that "[t]he testimony of Dr. Rossby renders [his] mental state at the time of the encounter with [the victim] objectively reasonable," sufficient to support a conviction for voluntary manslaughter, rather than second degree murder. We respectfully disagree.

The concept of diminished capacity recognizes that a defendant may present expert, psychiatric testimony "'aimed at negating the requisite culpable mental state.'" State v. Perry, 13 S.W.3d 724, 734 (Tenn. Crim. App. 1999) (quoting State v. Hall, 958 S.W.2d 679, 688 (Tenn. 1997)). "While diminished capacity is not an excuse or justification for committing the offense, it contemplates an acquittal of the indicted offense and a conviction for a lesser included offense." Id. (citing Hall, 958 S.W.2d at 688). The jury heard Dr. Rossby's exhaustive testimony on serotonin, as well as the defendant's testimony regarding his long history of chronic drug and alcohol abuse, his childhood treatment for intermittent explosive disorder, and his heavy drug and alcohol use at the time of the shooting. Before deliberating, the jury received appropriate instructions on the elements required to prove first degree premeditated murder, first degree felony murder, second degree murder, and voluntary manslaughter, including the requisite *mens rea* for each offense. It also received an instruction on diminished capacity.[3] By finding the defendant guilty of second degree murder, the jury obviously rejected his claim that he was incapable of forming a knowing mental state at the time of the shooting, or that the shooting occurred in a state of passion produced by adequate provocation. This was within its province. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995) ("Whether the acts constitute a 'knowing killing' (second degree murder) or a killing due to 'adequate provocation' (voluntary manslaughter) is a question for the jury."). The evidence in this case, viewed in the light most favorable to the State, was sufficient for a rational trier of fact to reject the defendant's claim of self-defense, and to conclude that the defendant was aware of his conduct and its likely results at the time the shooting occurred. We, therefore, conclude that the evidence is sufficient to sustain the defendant's conviction for second degree murder.

---

[3] The record contains the following jury instruction:

> The state must prove beyond a reasonable doubt the culpable mental state of the accused. Culpable mental state means the state of mind of the accused at the time of the offense. This means that you must consider all of the evidence to determine the state of mind of the accused at the time of the commission of the offense. The state of mind which the state must prove is contained in the elements of the offense(s) as outlined in these instructions [above][below].
>
> In this case, you have heard evidence that the defendant might have suffered from a mental [defect][condition] which could have affected [his][her] capacity to form the culpable mental state required to commit a particular offense.
>
> If you find from the evidence that the defendant's capacity to form a culpable mental state may have been affected, then you must determine beyond a reasonable doubt what the mental state of the defendant was at the time of the commission of the offense to determine of which, if any, offense [he] is guilty.

## B.  Criminal Attempt to Commit Especially Aggravated Robbery

The defendant also contends that the evidence was insufficient to support his conviction for attempted especially aggravated robbery, again arguing that the inconsistent verdicts demonstrate that the jury could not have accredited the witnesses for the State.  However, as we have previously discussed, consistency between verdicts on separate counts of an indictment or indictments is not required in Tennessee.  See Wiggins, 498 S.W.2d at 93.  A person commits criminal attempt who, "acting with the kind of culpability otherwise required for the offense: . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense."  Tenn. Code Ann. § 39-12-101(a)(3) (1997).  Especially aggravated robbery is defined as a robbery "[a]ccomplished with a deadly weapon; and [w]here the victim suffers serious bodily injury."  Tenn. Code Ann. § 39-13-403(a) (1997).  Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear."  Tenn. Code Ann.§ 39-13-401(a) (1997).

The evidence at trial, viewed in the light most favorable to the State, establishes that the defendant, armed with two guns, approached the group in which the victim was standing and ordered him to "drop it off." He then threw the victim face down on the porch and demanded his money. As the victim was pulling his pockets out and protesting that he had no money, the defendant shot him in the legs and then in the head, causing his death.  This evidence was sufficient for a rational trier of fact to find the defendant guilty of attempted especially aggravated robbery beyond a reasonable doubt.

## IV.  Sentencing

The defendant's final two issues involve challenges to the trial court's sentencing determinations.  When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct."  Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances."  State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment.  Tenn. Code Ann. §§ 40-35-103, -210;  State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentences imposed by the trial court are erroneous.

## A. Enhancement Factor (16)

The defendant first contends that the trial court erroneously applied enhancement factor (16), "[t]he crime was committed under circumstances under which the potential for bodily injury to a victim was great," Tenn. Code Ann. § 40-35-114(16) (1997 & Supp. 2002), to enhance his sentence for attempted especially aggravated robbery. He argues that the factor was inappropriate because a potential for bodily injury is inherent in the offense. The State responds that the trial court appropriately applied enhancement factor (16) based on the risk of bodily injury to individuals, other than the victim, who were on the porch at the time of the offense. The State further argues that, even if enhancement factor (16) was erroneously applied, the remaining enhancement factors found applicable by the trial court support the enhanced sentence.

Enhancement factors may be applied "only when the factors are 'appropriate for the offense' and 'not themselves essential elements of the offense.'" State v. Lewis, 44 S.W.3d 501, 504 (Tenn. 2001) (quoting State v. Poole, 945 S.W.2d 93, 95 (Tenn. 1997)). Since serious bodily injury is an essential element of especially aggravated robbery, enhancement factor (16) may not be applied on the basis of the great potential for bodily injury to the victim of the offense. See State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995). Here, the trial court applied enhancement factor (16) based not on the risk of bodily injury to the victim, but on the risk of injury to the several individuals present on the porch at the time the defendant committed the offense. However, our supreme court has recently held that enhancement factor (16) may not be based on the risk of injury to individuals other than the victim of the crime. State v. Imfeld, 70 S.W.3d 698, 706 (Tenn. 2002). Therefore, the trial court erred by applying this enhancement factor to the defendant's sentence for attempted especially aggravated robbery.

Nonetheless, we agree with the State that the other enhancement factors applied by the trial court, combined with the absence of mitigating factors, justify the maximum sentence that was imposed for the offense. In addition to enhancement factor (16), the trial court found the following enhancement factors applicable to this offense:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;

(10) The defendant had no hesitation about committing a crime when the risk to human life was high.

Tenn. Code Ann. § 40-35-114(1), (5), (8), (10) (1997). In addition, the trial court found enhancement factor (9), the defendant possessed or employed a firearm during the commission of the offense, see Tenn. Code Ann. § 40-35-114(9), applicable to the second degree murder conviction. The defendant does not contest these factors, and the record supports their application.

## B. Excessive Sentences

As his final issue, the defendant contends that the trial court erred by imposing excessive sentences for both offenses. Specifically, he argues that the trial court erred by failing to apply his low serotonin level as a mitigating factor. The defendant asserts that evidence that his serotonin level "plainly rendered him unable to restrain impulses" should have operated to reduce his sentences from the maximum in the range. The State contends that the trial court did not err by failing to apply the defendant's low serotonin level as a mitigating factor, since the evidence at trial showed that the defendant did not act impulsively when he committed the crimes. We agree with the State.

As a standard offender convicted of attempted especially aggravated robbery, a Class B felony, the defendant was subject to a sentence ranging from eight to twelve years. See Tenn. Code Ann. § 40-35-112(a)(2) (1997). His conviction for second degree murder, a Class A felony, carried a sentence ranging from fifteen to twenty-five years. See id. § 40-35-112(a)(1). The sentence to be imposed for a Class A felony is presumptively the midpoint in the range when there are no enhancement or mitigating factors present. Id. § 40-35-210(c). For a Class B felony, the presumptive sentence is the minimum in the range when no enhancement or mitigating factors are present. Id. For both Class A and Class B felonies, the procedure is for the trial court to increase the sentence within the range based upon the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. Id. § 40-35-210(d), (e). The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as it complies with the purposes and principles of the 1989 Sentencing Act, and its findings are adequately supported by the record. Id. § 40-35-210, Sentencing Commission Cmts.; State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

At the sentencing hearing, the trial court found that evidence of the defendant's background, including Dr. Rossby's testimony regarding his low serotonin level and the problems it had caused him, was a slight factor in mitigation but entitled to very little, if any, weight and, thus, did not "mitigate[] the enhancement factors" in the case. The trial court rejected the defendant's proposed mitigating factor that he acted under strong provocation. See Tenn. Code Ann. § 40-35-113(2). The trial court also declined to apply the defendant's serotonin level as a mitigating factor under either subsection (3) or (8) of Tennessee Code Annotated section 40-35-113, finding that it constituted

neither substantial grounds tending to excuse or justify his conduct, see id. § 40-35-113(3), nor a mental or physical condition that significantly reduced his culpability for the offenses. See id. § 40-35-113(8). The trial court first explained its reasoning when it rejected the defendant's serotonin level as a "substantial ground" that excused his conduct for the attempted especially aggravated robbery:

> With regard to the issue of [the defendant's] serotonin levels, my recollection of the testimony of the doctor was that even with his low serotonin levels, he may have an inability to control his impulses once they fired up or if a situation arose. But in this case, the proof that was presented in this case, was that it appears [the defendant] had the intent to commit an armed robbery and was not acting under impulse but was acting with a cool, collective intent to commit an armed robbery, and during the course of that armed robbery shot and killed somebody. And for those reasons, this court doesn't find that [the defendant's] low serotonin level affected his ability to commit the crime of an aggravated robbery or attempted aggravated robbery [sic], and then during the course of that he killed [the victim].
>
> So I don't find that there are any substantial grounds, and the key word there being substantial grounds, that excuse or justify his conduct.

In rejecting the defendant's serotonin level as a physical or mental condition that reduced his culpability for the crime, the trial court stated:

> Again, even though understanding and accepting the testimony of the doctor in this case about the low serotonin level, I don't find that was a factor that affected or entered into the commission of this offense, based on the proof that was presented, that there was anything that caused -- from his low serotonin level that caused him to commit the offense of an attempted especially aggravated robbery and the murder. I just don't find from the proof that was sufficiently shown, so I'm not going to consider that.

The trial court used similar reasoning to reject the serotonin evidence as either a substantial ground that excused the defendant's conduct, or a mental condition that significantly reduced his culpability for second degree murder, finding that the defendant's actions in shooting the victim first in one leg, then in the other leg, and finally in the head, did "not appear to . . . be impulse actions," or a killing committed in a "los[s] of control manner," but appeared instead to be "a planned, albeit maybe short, but calculated effort, knowing killing, if you will, of an individual."

-19-

The defendant contends that by finding he committed the offenses in a cool and calculated manner rather than impulsively, the trial court contradicted the verdict of the jury which, by acquitting him of premeditated and felony murder, "[c]learly . . . found that [his] actions were not cool, calculated, deliberate and premeditated." We disagree. Nothing in the jury's verdicts contradicts the trial court's finding that the crimes were not impulsive, and that the defendant's serotonin level therefore played no role in their commission. Although the jury rejected premeditated or felony murder, they convicted the defendant of second degree murder, "a knowing killing of another," rejecting his claim that the killing occurred in a state of passion produced by adequate provocation. The trial court correctly noted that the evidence at trial did not show the crimes to have been committed on impulse, as well as Dr. Rossby's testimony that a crime must be impulsive in order for an individual's serotonin level to have played any role in its commission. We, therefore, conclude that the trial court did not err by failing to apply evidence of the defendant's low serotonin level as a mitigating factor to reduce the defendant's sentences from the maximum in the range.

In sum, we conclude that, although the trial court erroneously applied enhancement factor (16) to the defendant's sentence for attempted especially aggravated robbery, it did not err in failing to apply the defendant's serotonin level as a factor in mitigation. We further conclude that the remaining enhancement factors that were appropriately applied, combined with the absence of mitigating factors, justify the maximum sentences imposed in this case.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

ALAN E. GLENN, JUDGE

-20-